NOTICE

Decision filed 03/18/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250899-U

NOS. 5-25-0899, 5-25-0900, 5-25-0901 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* LELAND S., COLT S., and CHASE S., Minors | ) ) ) | Appeal from the Circuit Court of Moultrie County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 20-JA-12, 20-JA-13, 20-JA-14 |
| Katlyn D., | ) ) | Honorable Jeremy J. Richey, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Barberis and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the circuit court of Moultrie County that terminated the parental rights of the respondent mother was not against the manifest weight of the evidence, and therefore, this court affirms the judgment.

¶ 2    In this consolidated appeal, the respondent, Katlyn D. (Mother), contends the circuit court of Moultrie County erred when it entered an order that terminated Mother's parental rights to the minor children, Leland S., who was born in July of 2017, and twin siblings Colt S. and Chase S., who were born in November of 2019. Specifically, Mother contends the trial court's decision was against the manifest weight of the evidence with regard to the court's finding of Mother's unfitness, and with regard to the court's finding that it was in the best interests of the minors for Mother's parental rights to be terminated. For the reasons that follow, we affirm.

1

¶ 3                                I. BACKGROUND

¶ 4    On December 16, 2020, the State filed petitions for adjudication of wardship in the following three cases: 20-JA-12, 20-JA-13, and 20-JA-14. The first case involved Leland, and the subsequent two involved, respectively, Colt and Chase. Because the pleadings that followed are for the most part identical, we will refer to the pleadings in 20-JA-12 unless otherwise noted, and we will discuss the cases collectively wherever possible. The petitions alleged, with regard to each child, that the child resided with Mother and the children's biological father (Father), who is not a party to this appeal. We will refer to Father in this disposition only when necessary for an understanding of the trial court's rulings in relation to Mother's appeal. The petitions further alleged that each child was neglected in that (1) he resided in an environment that was injurious to his welfare and that of his siblings because the environment exposed him "to missed medical and mental health care appointments," and (2) Mother and Father did "not provide adequate support and medical care necessary for" his well-being and that of his siblings. The petitions alleged that it was in the best interests of the boys to be adjudicated wards of the court, but that it was also in their best interests to remain in the home with Mother and Father "so long as the parents cooperate with the service plan developed by One Hope United, to assist and support the parents in dealing with the medical needs of the" boys.

¶ 5    On March 24, 2021, a temporary custody order was entered, placing the boys in the care of the Illinois Department of Children and Family Services (DCFS). A shelter care report indicated that on the previous day, Leland had been "found walking in his underwear near a park" and was taken into protective custody by police. The report indicated that when DCFS followed up, they found the condition of the home to be "dirty," with "rotten food all over the floors," and Leland and Colt both to be dirty and bruised as well. Father was arrested for child endangerment.

2

¶ 6    On August 10, 2021, an amended petition was filed as to Leland only. It alleged that Leland was neglected as a result of inadequate supervision by Mother and Father. On August 16, 2021, an adjudicatory order was entered, wherein the trial court found the boys to be neglected for the reasons alleged in the petitions. The order found that the neglect was inflicted by Mother and Father.

¶ 7    On November 8, 2021, a dispositional order was entered, wherein the trial court found that Mother and Father were unable to care for the boys, and wherein the trial court made the boys wards of the court. Guardianship and custody of the boys was placed with DCFS, with a permanency goal of returning the boys home within 12 months. Mother and Father were admonished to cooperate with DCFS, and to comply with their service plans.

¶ 8    Although no permanency review hearing transcripts are present in the record on appeal, seven permanency orders are present with file-stamped dates of April 27, 2022, October 26, 2022, January 24, 2023, April 25, 2023, September 22, 2023, July 25, 2024, and July 2, 2025. In the second and third of these seven orders, the trial court found that Mother and Father had made reasonable and substantial efforts in the recommended services. However, the trial court found in the other five orders that Mother and Father had not made reasonable and substantial efforts in the recommended services. The trial court did not find, in any of the seven orders, that either parent had made substantial progress in the recommended services.

¶ 9    On November 20, 2024, the State filed what was styled as a "motion seeking [a] finding of unfitness and termination of parental rights of [Mother and Father]." The motion alleged that Mother and Father were unfit because they had failed to (1) maintain a reasonable degree of interest, concern, or responsibility for the welfare of the boys; (2) make reasonable efforts to correct the conditions that were the basis for the removal of the boys during any of the four nine-

3

month periods at issue, specifically November 8, 2021, to August 8, 2022; August 8, 2022, to May 8, 2023; May 8, 2023, to January 8, 2024; and January 8, 2024, to October 8, 2024; and (3) make reasonable progress toward the return of the boys during any of the aforementioned nine-month periods.

¶ 10 A fitness hearing began on September 18, 2025. At the outset of the hearing, the State asked the trial court to take judicial notice of the prior records of proceedings and orders entered in each boy's case, specifically the adjudicatory orders, dispositional orders, and all "orders that were entered thereafter." No parties objected, and the court stated that it would take said notice. The State moved for admission of the curriculum vitae of Dr. Judy Osgood, and of the parenting capacity assessment Dr. Osgood authored regarding Mother. Again, there was no objection, and the exhibits were admitted. The parties further stipulated that Dr. Osgood was not available to testify in person, and that her credentials and assessment were admitted instead of live testimony.

¶ 11 Because of its relationship to the issues raised by Mother in this appeal, we discuss Dr. Osgood's parenting capacity assessment in detail prior to recounting the testimony of the other witnesses. We note that Dr. Osgood's assessment was dated December 7, 2022, and stated that the date of the evaluation was December 6, 2022, both of which were nearly three years prior to the date of the fitness hearing, but were during the second of the four nine-month periods alleged in the State's motion. Dr. Osgood stated that on December 7, 2022, Mother was a 25-year-old woman whose psychological history included past diagnoses of dependent personality disorder, borderline intellectual functioning, adjustment disorder with depressed mood, specific learning disorder (mathematics), and a history of physical abuse in childhood, as well as spouse/partner psychological abuse. Dr. Osgood noted that although Mother was reported to have made some progress in counseling and domestic violence treatment, she "struggled to function independently,

4

having difficulty meeting her financial obligations since moving into her own residence." She further noted that Mother was hospitalized in 2016 for one month due to suicidal ideation, and that she "reported having postpartum depression." Mother also reported taking medication following a diagnosis of bipolar disorder.

¶ 12   With regard to Mother's involvement with DCFS, Dr. Osgood stated that the history she received indicated that twins Colt and Chase were born prematurely, and that Colt "was given a synagis injection due to being at high risk for [respiratory syncytial virus]." In March 2020, Colt was due for an additional injection, but "the parents did not respond to 10 phone calls regarding [Colt's] medical needs," even though Colt's failure to get the injection "could lead to long term harm or death." Dr. Osgood noted that Chase had complex medical needs as well, "including AV valve heart defect, pulmonary hypertension and hemihypertrophy," and that "Chase requires a feeding tube, tracheotomy and a ventilator." Chase resided at a special-needs housing facility in Peoria. Dr. Osgood also recounted the incident in which Leland was found wandering unsupervised in his underwear near a park.

¶ 13   Based upon her evaluation of Mother, Dr. Osgood concluded that Mother's "ability to meet minimum parenting standards [was] questionable," and that "her special needs and medically complex children clearly exacerbate[d] her limitations." Mother did not demonstrate, while the boys were in her care, "the ability to safely and responsibly parent" them. Although the boys seemed to enjoy interacting with Mother, she "appeared to struggle in communicating with and parenting her children." Dr. Osgood concluded that, at times, Mother "seemed to have difficulty focusing her attention on more than one child at a time," and "did not seem to know how to talk to [Colt] and soothe him" when Colt was upset. Dr. Osgood concluded that Mother clearly cared

about her children and expressed a desire to parent them, but that Leland and Colt did not seem as secure with Mother as they did with Mother's mother, who was their foster parent.

¶ 14    Dr. Osgood further concluded that, with regard to Mother's borderline intellectual functioning, Mother "appeared somewhat slow to respond to her children and at times, did not seem to know how to soothe or comfort them." Dr. Osgood concluded that in light of the special needs of the boys, Mother "would require extensive assistance if any or all three of these children were placed in her care." She opined that there would be "significant risks to the children if returned to [Mother's] care." She reiterated that Mother presented "with mental health challenges and intellectual deficits that limit[ed] her capacity to safely and responsibly parent," and that Mother had "never demonstrated the ability to establish and maintain an independent level of functioning[,] with indication she is unable to care for herself, let alone her children."

¶ 15    The first witness to present live testimony was Father. Of relevance to Mother's appeal, Father testified that he and Mother did not speak often, but that if he had custody of the boys, "it would have to be a more consistent thing to where we could coparent on a more mature level than *** in the past." Father did not testify as to any of the issues referenced in Dr. Osgood's assessment of Mother.

¶ 16    Thomas Lehew testified that he was a patrolman with the Sullivan Police Department. He testified that on April 8, 2022, he received "an animal complaint" regarding Mother. He testified that he received photographs of a dog that appeared to be malnourished. Lehew testified that he later learned "that the dog had been placed in a foster care situation for a neglected animal." On cross-examination, he testified that he believed Mother left the dog alone for a "couple days," but he was not sure. He further testified that he did not believe there were any children living in Mother's home at the time.

¶ 17    Benjamin Woolridge testified that he was a police officer with the Sullivan Police Department. He testified that on July 31, 2025, he was dispatched to Mother's residence following "an anonymous complaint that there were dogs left in the residence." He was informed by dispatch of the 2022 incident with Mother and a neglected dog. He testified that he responded to Mother's residence and that when he approached it, he saw "various trash littered around the *** outside," as well as "possibly hundreds of flies on the windows, coating the windows, along with gnats." He testified that he "was met with the odor of—smelled like decomposition, and that was while all the doors and windows were sealed."

¶ 18    Woolridge testified that when he entered the residence, he encountered "a small German Shepherd puppy in a cage" with "rotting feces, which had been ground into his bed." He testified that the dog "looked like it hadn't eaten in several days," with all of its bones visible through its skin, and with its eyes "oozing puss." He testified that Mother was not present, and that there was no way the dog could get out of its cage. Woolridge testified that in a back bedroom he found another dog, "a small black possibly lab mix." He testified that the dog appeared to have "some sort of injury to its face," and that it "looked emaciated *** like it hadn't eaten in several days." He testified that he could see the dog's "ribs and bones through its skin," and that as soon as he opened the bedroom door, the dog ran past him to a back bathroom, where the dog "proceeded to drink all of the dirty toilet water out of the toilet." He testified that there was no clean water or food available for either dog. He testified that in the kitchen there were "pots and pans *** full of moldy, rotting pasta and other food, which was just being coated and devoured by flies and gnats." He added that the residence "[d]id not appear to be a livable house."

¶ 19    Woolridge testified that he interviewed Mother later that day, and that she told him that due to car problems, she had been staying at a residence in Mattoon so that she could still go to

7

work. He testified that Mother told him that she left the dogs with food and water. He testified that when he told her about the current condition of the dogs and the residence, Mother "appeared to be unphased and just said 'okay.' " Woolridge testified that when he asked Mother what plans she had made for someone to take care of the dogs while she was gone, she told him she had not made any plans. He testified that he informed Mother that she could not leave dogs like that. On cross-examination, Woolridge testified that Mother told him that because she left food for the dogs when she left her residence on Sunday, Mother "thought that they would be fine until Friday when she returned with her car."

¶ 20    Jo Denise Drummond testified that she was related to Mother by adoption. She testified that she coordinated with the Sullivan Police Department following the 2022 dog incident, because Mother was in the hospital. She testified that when she checked on the dog, she found "feces on the floor, urine on the floor," and the dog "in a cage, no food, no water." She testified that she was "shocked" by "how skinny the dog was" and wondered if it would survive.

¶ 21    Amanda Drummond testified that she was Mother's mother, and the foster parent for Leland and Colt. She testified that she was the parenting time supervisor for Mother's visits with Leland and Colt, which occurred every Sunday for two hours. When asked if Mother was "able to take the primary parenting role" during visits with the two boys, Drummond testified, "Occasionally, she interacts with them, but a lot of times there's a lot of her being constantly on her telephone." She testified that Leland and Colt had lived with her since 2021, when they were removed from the care of their parents.

¶ 22    Drummond testified that she tried to visit Chase "every other month," but that due to Chase's severe medical issues, it was often difficult, because she did not want to take Leland and Colt to visit Chase when they were sick. She testified that she believed Chase recognized her and

the boys, and that he smiled at Leland and Colt when they visited. She testified that she thought she had taken Mother to visit Chase two times. With regard to the 2022 dog incident, Drummond testified that although she did not go into Mother's residence that day, she had visited previously, and she believed that the description of the condition of the residence by the earlier witness was accurate.

¶ 23    On cross-examination, she testified that the boys never asked for additional time with Mother, or with Father. When asked if Mother ever spent the night at Drummond's home, Drummond testified, "No." When asked if the boys "enjoy time with" Mother when Mother visits them, Drummond testified, "They are excited when she first gets there. Leland more so than Colt. Colt is more[,] he comes running to me." When asked if Mother showed "loving interactions" when visiting with the boys, Drummond testified, "As I mentioned earlier, she tends to get on her phone quite a bit during the visit," and clarified that Mother does not interact with the boys on her phone, "the phone interaction is just *** between her and her phone." Drummond testified that on one occasion, she attempted to take Mother to see Chase, but they were turned away without explanation, even though no preauthorization for the visit was required. When asked how often, during each of Mother's weekly two-hour visits with Leland and Colt, Drummond had to "re-direct" Mother from Mother's phone to the boys, Drummond testified, "Quite a bit." She testified that she had to do so "[a]t least 10" times per visit, and possibly "20 or more" times per visit.

¶ 24    Mother was the next witness to testify. Before questioning Mother in detail, the State requested a "grant of immunity concerning certain questions" the State wished to ask Mother related to current misdemeanor charges Mother faced "pertaining to animal cruelty." Mother's counsel did not object, and the court granted the State's request.

9

¶ 25    Mother testified that she was the mother of Leland, Colt, and Chase. With regard to the 2025 incident involving her two dogs, she testified that she was home and took care of the dogs every day until Friday, July 25. She testified that her home was clean when she left it on July 25. She could not explain how her home got in the condition described by Woolridge. She testified that when she came home "the bedroom was trashed," but she could not explain how it became so. She testified that she did not disagree with Woolridge about the condition of the home but thereafter stated that it was "[t]he dog" that messed it up. She testified that the dog in the bedroom must have escaped from its cage and made the mess that was found, including the urine and feces, even though she claimed she had taken the dog out that morning. She testified that she was at the residence at least once each day between July 17 and July 31, and that she provided the dogs with food and water and let them outside to relieve themselves.

¶ 26    When asked how often she had visited Chase, not counting the time she and Drummond were turned away without explanation, Mother testified that she visited Chase a total of three times in approximately three years. She agreed this was not often enough but testified that she was able and prepared to take care of Chase on her own, if allowed to do so. She testified that she believed she could take care of all three boys on her own, if allowed to do so. She testified that she would arrange childcare during her work hours. When asked how she would manage Chase's need for 24-hour care, in light of her work schedule, Mother testified she "would look for a nurse to be able to take care of him." Mother testified that she also had a daughter, who lived with the daughter's father, but that eventually she hoped to have the daughter live in the home with Mother and the three boys. When asked if she had sent "gifts or correspondence of any kind" to Chase, Mother testified that she had sent him diapers and clothes.

¶ 27    Mother testified that she was aware of Leland's medical needs, that he had seen a pediatric psychiatrist, and that he had post-traumatic stress disorder (PTSD). She testified that if Leland does not like something that happens, "he gets upset," and that Leland took Adderall and Zoloft, although she did not know how often he took the medications, or what the dosages were. She testified that Colt, like Chase, had pulmonary hypertension. She testified that she was aware of the ongoing medical needs and appointments of Leland and Colt, and of their importance. Mother testified that she had made arrangements with her job so that she could take time off if she needed to take the boys to appointments.

¶ 28    On cross-examination, Mother testified that she had been seeing a counselor "for over a year," had completed "multiple parenting classes," was seeing a psychiatrist, and was taking the medications Abilify and Lamictal. She testified that if she did not take her medications, she would "feel irritable," but that if she did take them, her moods were "a little better" and she was "able to function better." She testified that her counselor was helping her learn "coping mechanisms" for dealing with her bipolar disorder. With regard to the 2025 dog incident, she agreed that the dogs did not cause the messy dishes and food on the kitchen counter and further agreed that "the dishes had been sitting out for a week roughly."

¶ 29    Mother was asked what was required by her DCFS service plans in this case. She testified that she was required "to maintain housing, maintain [her] vehicle, maintain going to counseling, see [her] psychiatrist," and maintain a job and stable income. She testified that she had been at her current job for three years and had provided pay stubs to DCFS. She testified that she had lived at her current residence for approximately three years and believed that DCFS had conducted three home visits. Mother testified that she had completed a domestic violence program in July of 2023, and that she had completed "parenting classes twice." She testified that she saw her counselor

11

regularly, and her psychiatrist, and was in "complete compliance" with her medical plan, including taking her medications.

¶ 30    Mother testified that in 2023, she completed medical training to help care for Chase. She testified that every Tuesday she called Chase's living facility to check on Chase and kept up with his developments. When asked if she had visited Chase three times or four times, she testified, "Four times." She testified that over the course of the case, she believed she had been assigned "10 or 11" different caseworkers.

¶ 31    When cross-examined by counsel for DCFS, Mother again testified that she called every Tuesday to check on Chase and disputed the assertion from Chase's facility that as of March 19, 2025, Mother had not called since the spring of 2023. Mother could not explain why the facility would make a false assertion. When asked if she had tried to call or do a video visit directly with Chase, Mother testified, "I have not been able to do that." She testified that she tried not to be on her phone during her parenting time with Leland and Colt, but that sometimes Leland wanted to play games on her phone, and she would let him. She added, "but then there's sometimes that I kind of get a little bit distracted." She agreed with Drummond's testimony that generally Drummond had to direct Mother, possibly 20 times or more per two-hour visit, to get off her phone. When asked what kinds of things she was doing on her phone when she was not playing games with Leland, Mother testified, "like if my daughter's dad texts me, I would text him back if I need to be able to go over and see my daughter." She agreed that she would also be "scrolling social media" at times. She testified that she sometimes sent Chase Christmas and birthday gifts, and that she provided Easter baskets for the boys as well. She testified that during the times she visited Chase, she was not on her phone.

¶ 32    Janessa Watson testified that she was a foster care case manager with One Hope United and had been for three years. She testified that until one month prior to the hearing, she was "the primary caseworker" for Leland, Colt, and Chase. She testified that she received the police report from the July 31, 2025, dog incident, and that she had conducted a home inspection of Mother's residence prior to that, on June 24, 2025. Watson testified that she was "surprised" by the police report, because during the home inspection Mother's residence was "appropriately clean [and] orderly," with the only issue being "an odor of pet urine." She testified that the police report and accompanying photographs raised concerns for her, One Hope United, and DCFS about "Mother's ability to maintain an appropriate residence." She testified that with each of the boys having special needs and health issues, it would be a "problem" to allow the boys to live in a residence that was in the condition seen in the police photographs.

¶ 33    Watson agreed that it was "a fair assessment" to state that, in light of the reasons for the original removal of the children from Mother's care, it was as if the case had "gone full circle" and was "right back at the start even though both of the parties [had] completed a number of services." Watson testified that Mother was cooperative about participating in services, but Watson believed that Mother was "not benefiting from services." She testified that Mother could demonstrate that she had benefited from her services if Mother presented a cleaner environment, was more attentive to the boys during visits, provided the boys with "things they need," and made "the effort to go see Chase." She agreed that there was "some difficulty" with regard to Mother being able to visit Chase, but added that if Mother had car problems, Mother was allowed to ride with Drummond in Drummond's car. She testified that Chase was now considered to be medically stable, and under the right circumstances could be discharged for home living.

13

¶ 34    On cross-examination, Watson testified that she visited Mother's home approximately two weeks prior to the hearing, and that it was again "appropriate" and "cleaned up." She testified that she gave Mother approximately one week's notice prior to that visit. When asked to define what it meant for Mother to be "benefiting" from Mother's services, Watson testified that Mother should "be able to keep a safe and stable home, where it's not cluttered, where there is not dog feces, where there is not malnutrition with animals." When asked if that had only "come up one time in the four years of this case," Watson testified that there was also an incident in 2022, although Watson conceded that she did not know about that incident until it was mentioned at the hearing. Watson continued that "benefiting" from services "doesn't mean rotting food on the stove, a week away from the home with animals in it." She added, "I don't think she's benefiting because I don't know if she has fully grasped what it's going to take to take care of her kids on a daily basis, if she cannot maintain the cleanliness of her home when it's just her." Watson testified that she believed parenting classes and counseling should "cover how to appropriately keep your home clean," but conceded that she did not know if that was a topic covered with Mother during her services. Watson testified that she believed counseling was helping Mother with her mental health needs.

¶ 35    Watson testified that during her time on the case, Mother was not "any closer to getting her children returned than the time the case came in." She based her conclusion on the fact that Mother "still [was] not attentive in visitation," and "still [did] not provide what [the boys] need[ed] during visitation." She added that Mother's "environmental situation, the lack of paying bills," and other factors created "a constant lack of consistency." She added that the fact that Mother was still on third-party supervised visitation after four years "just shows that we're not ready to move forward" with returning the boys to her care. She testified that she "wouldn't doubt" that there had been

14

"about 10 different" caseworkers on the case, in light of the fact that the case had been "open for five years."

¶ 36    Following Watson's testimony, the hearing recessed for the day. When the hearing continued on the following day, September 19, 2025, the parties presented argument. The trial court thereafter stated that it found that the State had met its burden to prove, by clear and convincing evidence, that both Mother and Father failed to make any reasonable progress in the case. The court noted Dr. Osgood's conclusion that Mother had "[b]orderline intellectual functioning," and stated that the court found Mother's testimony "to not be credible whatsoever." The court stated that it did not know if Mother "was just outright lying" or if due to her limited functioning she was "unable to express herself in a way that corresponds to reality." The court posited that maybe Mother believed what she was saying, but the court found her testimony "was just not true," especially "her testimony when she was testifying about the dogs," which "just did not have any correspondence to reality of the real situation dealing with those dogs, their condition, and the condition of the house." The court further found that the State was correct that after four years, "nothing has changed" and "[t]he parents just aren't making any progress." The court stated that there was "just no evidence" that Mother and Father were taking the information they had learned "and applying it in a way that could make a difference in the parenting in this situation."

¶ 37    The court acknowledged that Mother and Father both were "in some counseling at the moment," but stated that these efforts were "brand-new *** within the last couple weeks" and were "too little, too late." The court found it "telling" that "when both parents are asked about their plan for how they're going to deal with all these children if they get them back, I would say their plan is not a plan." The court described the plans as too generalized, with "[n]o specific action plan how this is actually going to get done." The court stated this was particularly problematic in light

15

of the boys' extensive special needs, especially with regard to Chase, and added, "if there's ever a case that needed careful planning, this is one of them."

¶ 38    The court stated that it agreed with the State that it was problematic that after four years, both parents still were on supervised visits, and added that Mother was "not engaged in her parenting time." The court further stated that the removal of the boys from the home should have been "a wake-up call," but that instead the parents had made "no progress" toward the return of the boys. The court added that it found that the State had not met its burden with regard to the allegations that Mother failed to (1) maintain a reasonable degree of interest, concern, or responsibility for the welfare of the boys, and (2) make reasonable efforts to correct the conditions that were the basis for the removal of the boys during any of the nine-month periods at issue.

¶ 39    On October 23, 2025, a best interests hearing was held. Dr. Anjeli Stevens testified that she was a pediatrician and the medical director for Almost Home Kids in Peoria. She testified that Chase was a patient at the facility and had been since "he was approximately 14 months old." Dr. Stevens described Chase's complex medical conditions, care, and medications in detail, in a manner consistent with the other testimony recounted in this disposition. She testified that she did not know Jamie and Patrick Cox but knew that they were interested in becoming foster parents to Chase and had "started their training to care for Chase." Dr. Stevens testified that she had never spoken to Father or Mother, but that she knew that Mother had been on phone calls "more recently," whereas she believed there had been "no communication" with Father since 2023.

¶ 40    When asked what kind of home placement would be appropriate for Chase, Dr. Stevens testified, "I think it would be ideal to have him be in a home" where there was "some medical experience just because Chase is quite complex and has a lot of medications, a lot of moving parts that need a lot of coordinating." Dr. Stevens opined that "it would be helpful for Chase to be in a

16

home for his caregivers to understand the complexity of his needs and understand why certain medications are given, and if a certain medication was missed or not given, it could really be detrimental for Chase." When asked if Chase was ready to be discharged from the facility, Dr. Stevens testified, "So medically speaking, he would be safe to discharge, but in order to be discharged from Almost Home Kids, it is required that they have at least two trained caregivers that have completed the training completely, and then they also have to have a minimum of 40 hours of skilled nursing scheduled." She testified that in terms of Chase's social and emotional development, "it would be very helpful for Chase to be in a stable home where he would only have one or two caregivers, where he would know what is expected from him, and the caregivers have expectations for Chase as well." She noted that her facility could provide well for Chase's medical needs, but that the facility was not designed to meet his social and emotional needs as Chase developed.

¶ 41    On cross-examination, Dr. Stevens testified that the potential foster mother had completed her training, and that the potential foster father had begun his training. She testified that they each also still needed to complete two 24-hour stays with Chase to demonstrate that they could "fully care for Chase independently." She testified that it was "hard to say" how long it would take for the foster parents to complete these tasks, because it depended on their availability, but she added, "they could come every day, they could get it done fairly quickly." Dr. Stevens testified that it was her understanding that in late 2022, Mother completed the initial training to care for Chase, and that in early 2023, Mother completed the two 24-hour stays that were required. She testified that given the length of time that had passed since then, Mother would be required to redo all of the training before Chase could be discharged to her care.

17

¶ 42    Jamie Cox testified that she was married to Patrick Cox, and that she had five children. She testified that one child was biological, and that the other four were through foster care or adoption. The three oldest children were now adults who did not live with her, and the younger two were nine years old and three years old and lived with her and Patrick. Jamie testified that they lived "[r]ight outside of Peoria" and had no plans to move. She testified that she initially became involved with Chase because she was a "pediatric vent and trach nurse" and had heard that there were a number of special-needs children at Almost Home Kids that needed to be adopted. Jamie testified that she and her husband were interested in providing foster care again and decided they wanted to support Almost Home Kids.

¶ 43    Jamie testified that she and her family visited Chase "regularly," that she attends his medical appointments, and that Chase "lights up like a Christmas tree when he sees" the family. She testified that she was employed as a home health nurse, and that all of her present clients were "trachs or vents." She testified that she had worked with "medically-complex children" for approximately 15 years and testified in detail about the conditions and needs of some of her clients. She testified that she was very familiar with Chase's needs, but that to her Chase seemed "like a normal little boy" because she was "so used to being around kids that have medically-complex cases."

¶ 44    Jamie testified that she would be able to accommodate all of Chase's medical equipment and other needs in her home. She testified that she had completed her initial training and planned to complete the two 24-hour stays within the next month. She testified that because of her proximity to Peoria, she planned to keep Chase's existing medical support system and doctors. Jamie testified that she planned to continue to work part-time outside of the home, and that her husband worked with special-needs children, mostly those with autism, through the school system.

18

She testified that she did not have any reservations about providing in-home care for Chase. She testified that when she and her husband were at work or away from the home, they would have nurses come to their home to provide care.

¶ 45    On cross-examination, when asked if she had sufficient space to accommodate Chase and his needs, Jamie testified that she had "an upstairs and downstairs and *** a basement." She added, "We have a room planned out for him that I was going to paint this weekend. It's on the ground floor *** and it has plenty of space for him and the nurses and a big closet for his medical needs." She testified that she and her husband were willing to provide Chase with all the support and services he needed in their home.

¶ 46    Patrick Cox testified that he was married to Jamie. He testified that he did not have any concerns about his family's ability to care for Chase. He added, "I feel that we're perfectly suited for a situation and all of Chase's challenges." Patrick testified that he was presently completing his training to care for Chase, and that if allowed, the family desired to adopt Chase. He testified that the family had been visiting Chase for "a couple years" and that they were "very excited" to adopt Chase and felt "extremely comfortable bringing him" into their home. On cross-examination, Patrick testified that the family had been visiting Chase once a week for approximately two and a half years. He testified about his work with special education children in the school district and testified that he was an Illinois-licensed special education paraprofessional.

¶ 47    Melissa Ruby testified that she was a teacher for the Peoria public schools, and that she was Chase's classroom teacher. She testified that she visited Chase "multiple times" over the previous summer, so that she could "get to know him before he started in [her] classroom." Ruby testified that her classroom was for "medically-challenged children," and that she currently had seven such students, including Chase. She testified that she could not address medical needs, but

19

that Chase came to school "with a nurse, and then we have two other nurses available for us at all times." She testified that Chase did well but missed a lot of school due to medical appointments and occasional hospitalizations. She testified that she did not know Jamie and Patrick Cox, but that she was "very excited" that Chase had the opportunity to be adopted. She testified that she believed "Chase would benefit from having a stable home environment," rather than living in a strictly medical environment. She testified that Chase's social and emotional needs would be better met in a stable home environment.

¶ 48    Watson testified that Leland and Colt were placed with Drummond, and that Drummond had indicated she wished to adopt them. Watson testified that Drummond had indicated that Leland suffered from attention deficit hyperactivity disorder and from "some social/emotional regulation issues." In addition, she testified that Leland was currently seeing a psychiatrist and had been diagnosed with PTSD and generalized anxiety disorder. Watson testified that Leland took medication for his conditions. She testified that Drummond had indicated to her that Drummond believed Leland was improving while in Drummond's care. Watson testified that Leland was "improving with his social and emotional needs," and that Drummond was "very calm," but also "very stern," with Leland, which provided him with "a bond [where] he feels safe, and she is able to calm him down whenever he has episodes." She testified that Leland told her that he wished to stay with Drummond.

¶ 49    Watson testified that Colt was doing "[v]ery well" with Drummond, and that Drummond was able to meet all of Colt's needs. She testified that Drummond had indicated that she was "willing and able to adopt both boys." Watson testified that Colt had "lung and heart" issues and saw specialist doctors. She testified that Drummond had "indicated and demonstrated a willfulness to get him to the appointments and to support him through them." She testified that she was aware

20

of Chase's situation as well, and that it was her opinion, and that of DCFS, that it was in the best interests of all three boys that the permanency goal be changed to adoption.

¶ 50　On cross-examination, Watson testified that Leland and Colt were both doing very well in school. She testified that there was sufficient space in Drummond's home for Leland and Colt. She testified that Colt, like Leland, wished to stay with Drummond. She testified that both boys stated that they would like to visit Mother and Father, but that they did not want to live with either of them. When questioned by counsel for DCFS about the basis for her opinion that the permanency goal should be changed to adoption, Watson testified that it was "the length of the case and the bonds that Colt and Leland" had with Drummond, who provided "all medical, environmental, and educational needs," as well as a stable home and unconditional love. With regard to Chase, she testified that the basis of her opinion was that Chase deserved "to be in a safe and loving home that can provide all of the complex needs for him."

¶ 51　Mother's counsel presented the testimony of Melissa Wassell, who testified that she was a foster care supervisor at One Hope United. She testified that she previously was a caseworker for Leland, Colt, and Chase. She testified that at one point she supervised Mother's visits with Leland and Colt, for a period of approximately three to five months, with one visit per month. She testified that Mother was generally active, attentive, and interactive with the boys during those visits. Wassell testified that nothing about Mother's behavior during the visits caused Wassell concern. On cross-examination, Wassell testified that she did not disagree with any of Watson's recommendations.

¶ 52　Following Wassell's testimony, and the arguments of the parties, the trial court found that the State had met its burden of proving that it was in the best interests of the boys for the parental rights of Mother and Father to be terminated. The court stated that it had considered all of the

21

appropriate statutory factors. With regard to the physical safety and welfare of the children, the court found that all three boys were currently placed in physically safe environments where their needs were being met. The court found that Leland and Colt had "significant ties with" Drummond, as well as a "developed identity" with her. The court stated that their needs related to family, culture, and religion were being met with Drummond, and their sense of attachment was to her. The court added, "Certainly, I don't think that they're at a place where they don't want any contact with their biological parents, but for all practical purposes, grandma is mom at this point."

¶ 53     The trial court recognized that Chase's situation was more complicated, because he was in an institutional setting and did not have the same opportunities for attachment and love. The court stated, however, "I can't think of a better placement for Chase than with the Coxes." The court described their testimony in detail, concluding that their home was "the perfect location for Chase growing up." The court added, "Children need permanence. These cases cannot go on forever." The court stated that Mother and Father had "been given more than ample time, and that's certainly not the only factor the court would consider, but they've had more than ample time." The court stated that it did not believe that Mother or Father would ever "be able to fully take care of Chase's needs." On October 24, 2025, the trial court entered a written order that was consistent with the court's oral pronouncements. This timely appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55     Parents have a fundamental liberty interest in the care, custody, and management of their children. *In re D.T.*, 212 Ill. 2d 347, 363 (2004). The involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the

22

Adoption Act (750 ILCS 50/1(D) (West 2024)). *M.I.*, 2016 IL 120232, ¶ 20; *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness"). Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *C.W.*, 199 Ill. 2d at 217. In other words, "only one ground of unfitness need be proved to find a parent unfit." *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 56    If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor children to terminate parental rights. *D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the court's focus necessarily shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life" (*D.T.*, 212 Ill. 2d at 364), because a prompt, just, and final resolution of a child's status, as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 57    On appeal, this court accords great deference to the trial court's decisions in termination proceedings because the trial court is in a better position to observe witnesses and to judge their credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the trial court's findings of parental unfitness or the child's best interest are against the manifest weight of the evidence, this court will not disturb the trial court's findings. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is

clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 58     In this case, the trial court found Mother unfit due to Mother's failure to make reasonable progress toward the return of the boys during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is judged by an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The "benchmark" for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent has made reasonable progress when the trial court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 59     On appeal, Mother contends the trial court's decision to terminate her parental rights was against the manifest weight of the evidence. With regard to fitness, Mother contends the trial court erred because the boys were removed from her care due to alleged neglect of their medical and mental health care needs, not because of the condition of her home. She also argues that Watson's testimony established that the home was mostly in a clean condition the last time Watson visited it. Accordingly, she contends the trial court erred when it stated that her issues with her dogs showed she had not learned from her service plans and could not take care of the boys. She further contends that her lack of a concrete plan for caring for the boys if they were returned to her should

not be used to judge her reasonable progress toward reuniting with the boys, especially in light of the fact that she offered testimony as to such a plan, and in light of the fact that she had so many caseworkers assigned to her over the course of this case, which she contends shows "[t]he disorganization and systematic failure of" DCFS, and which should not be held against her. With regard to the trial court's findings about Mother's phone usage during some visits, Mother contends that was "a small issue" that "should not support a finding of lack of reasonable progress over the course of multiple years." She contends that she "completed all of her required services, completing a few of them multiple times." She adds that "[t]hroughout the lengthy testimony it was never clear exactly what [she] failed to do or what she could have done to satisfy" DCFS.

¶ 60 We first note that Mother's assertion that the boys were removed from her care due to alleged neglect of their medical and mental health care needs, not because of the condition of her home, is not completely correct. It is true that the December 16, 2020, petitions alleged medical and mental health care neglect. However, those petitions further alleged that although it was in the best interests of the boys to be adjudicated wards of the court, it was also in their best interests to remain in the home with Mother and Father "so long as the parents cooperate with the service plan developed by One Hope United, to assist and support the parents in dealing with the medical needs of the" boys. The boys were not removed from Mother's care until March 24, 2021, when a temporary custody order was entered, placing the boys in the care of DCFS. A shelter care report indicated that on the previous day, Leland had been "found walking in his underwear near a park" and was taken into protective custody by police. The report indicated that when DCFS followed up, they found the condition of the home to be "dirty," with "rotten food all over the floors," and Leland and Colt both to be dirty and bruised as well. Accordingly, we reject Mother's contention that the dog incidents and the condition of her home were not at all relevant to this case. We note

25

as well that Mother did not object at the hearing to testimony about the dog incidents and the condition of the home, including to the testimony of Watson that it was "a fair assessment" to state that, in light of the reasons for the original removal of the children from Mother's care, it was as if the case had "gone full circle" and was "right back at the start even though both of the parties [had] completed a number of services."

¶ 61 In addition, although Mother did present her plan for caring for the boys if she regained custody of them, the trial court stated that it did not find Mother to be a credible witness, and further stated that the plans put forward by both parents were inadequate. The court specifically found it "telling" that "when both parents are asked about their plan for how they're going to deal with all these children if they get them back, I would say their plan is not a plan." The court described the plans as too generalized, with "[n]o specific action plan how this is actually going to get done." The court stated this was particularly problematic in light of the boys' extensive special needs, especially with regard to Chase, and added, "if there's ever a case that needed careful planning, this is one of them."

¶ 62 The court further found that the State was correct that after four years, "nothing has changed" and "[t]he parents just aren't making any progress." The court stated that there was "just no evidence" that Mother and Father were taking the information they had learned "and applying it in a way that could make a difference in the parenting in this situation." The court acknowledged that Mother and Father both were "in some counseling at the moment," but stated that these efforts were "brand-new *** within the last couple weeks" and were "too little, too late." The court stated that it agreed with the State that it was problematic that after four years, both parents still were on supervised visits, and added that Mother was "not engaged in her parenting time." The court further

26

stated that the removal of the boys from the home should have been "a wake-up call," but that instead the parents had made "no progress" toward the return of the boys.

¶ 63    These findings are supported by the record. As the State accurately notes, all of the permanency orders found that Mother did not make reasonable progress, and six of these seven orders encompassed the four nine-month periods at issue. In addition, Watson testified that during her time on the case, Mother was not "any closer to getting her children returned than the time the case came in." She based her conclusion on the fact that Mother "still [was] not attentive in visitation," and "still [did] not provide what [the boys] need[ed] during visitation." She added that Mother's "environmental situation, the lack of paying bills," and other factors created "a constant lack of consistency." Watson testified that one of the reasons she did not believe Mother was benefiting from Mother's services was because Watson did not "know if she has fully grasped what it's going to take to take care of her kids on a daily basis, if she cannot maintain the cleanliness of her home when it's just her." She testified that the fact that Mother was still on third-party supervised visitation after four years "just shows that we're not ready to move forward" with returning the boys to her care.

¶ 64    We also disagree with Mother's assertion that the trial court's findings about Mother's phone usage during some visits amounted to "a small issue" that "should not support a finding of lack of reasonable progress over the course of multiple years." In addition to Watson's testimony, Drummond provided relevant testimony as well. When asked if Mother was "able to take the primary parenting role" during visits with the two boys, Drummond testified, "Occasionally, she interacts with them, but a lot of times there's a lot of her being constantly on her telephone." On cross-examination, when asked if Mother showed "loving interactions" when visiting with the boys, Drummond testified, "As I mentioned earlier, she tends to get on her phone quite a bit during

27

the visit," and clarified that Mother does not interact with the boys on her phone, "the phone interaction is just *** between her and her phone." When asked how often, during each of Mother's weekly two-hour visits with Leland and Colt, Drummond had to "re-direct" Mother from Mother's phone to the boys, Drummond testified, "Quite a bit." She testified that she had to do so "[a]t least 10" times per visit, and possibly "20 or more" times per visit. Mother agreed with this testimony.

¶ 65     In addition, Dr. Osgood noted in her 2022 parenting capacity assessment that although the boys seemed to enjoy interacting with Mother, she "appeared to struggle in communicating with and parenting her children," and Dr. Osgood concluded that, at times, Mother "seemed to have difficulty focusing her attention on more than one child at a time," and "did not seem to know how to talk to [Colt] and soothe him" when Colt was upset. Dr. Osgood further concluded that in light of the special needs of the boys, Mother "would require extensive assistance if any or all three of these children were placed in her care." Clearly, Mother's inattentiveness and failure to successfully engage with her sons was a longstanding problem that was probative of her progress in this case, not the "small issue" Mother suggests on appeal.

¶ 66     With regard to Mother's allegation that the number of caseworkers she had over the course of this case may have hindered her progress, Mother does not point to evidence of any specific issue, with any specific caseworker, to support her allegation, which we conclude is mere speculation. In addition, evidence was presented that the number of caseworkers assigned to the case was related to the length of the case, with Watson testifying that she "wouldn't doubt" that there had been "about 10 different" caseworkers on the case, in light of the fact that the case had been "open for five years."

¶ 67     We find that the extensive evidence recounted above demonstrates, unequivocally, that "in the near future" the trial court would not be able to order any of the boys returned to Mother's

28

custody, and thus that Mother failed to make reasonable progress. See *L.L.S.*, 218 Ill. App. 3d at 461. In reaching this conclusion, we reiterate that the trial court was in the best position to judge the credibility of the witnesses, including Mother (see *Dal. D.*, 2017 IL App (4th) 160893, ¶ 53), and that we will not reweigh the evidence or reassess the credibility of those witnesses. *M.A.*, 325 Ill. App. 3d at 391. The opposite conclusion to that reached by the trial court in this case is not clearly apparent, and the trial court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the trial court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we will not disturb it. *A.W.*, 231 Ill. 2d at 104.

¶ 68　As explained above, "only one ground of unfitness need be proved to find a parent unfit." *J.P.*, 261 Ill. App. 3d at 174. Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the trial court's decision if the evidence supports its finding as to any of the grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64. Accordingly, we affirm the trial court's finding of unfitness on the basis of Mother's failure to make reasonable progress toward the return of the boys during any of the four nine-month periods listed in the motion.

¶ 69　Likewise, we conclude that the trial court's decision regarding the best interests of the boys was not against the manifest weight of the evidence. In deciding whether termination of parental rights is in a child's best interests, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and

29

(10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). Although the court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering or explaining its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 70    In this case, the trial court specifically stated that it had considered the requisite statutory factors, and the court discussed several of them, as recounted in detail above. Mother's arguments on appeal amount to a request that we reweigh those factors and find differently than did the trial court, which is something we will not do. See, *e.g.*, *M.A.*, 325 Ill. App. 3d at 391. Applying the appropriate standard of review, discussed above, we conclude that the evidence recounted above provides ample support for the trial court's decision. The opposite conclusion to that reached by the trial court regarding the best interests of boys is not clearly apparent, and the trial court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the trial court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we decline to disturb it. *A.W.*, 231 Ill. 2d at 104.

¶ 71                                    III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm the judgment of the circuit court of Moultrie County.


¶ 73    Affirmed.